[Civ. No. 19765.   Second Dist., Div. One.   Dec. 14, 1953.]

WILLIAM P. VON HASSELN, Respondent, v. GUS E. VON HASSELN, Appellant.

Crider, Runkle & Tilson and Garvin F. Shallenberger for Appellant.

William Jerome Pollack and Matthew M. Richman for Respondent.

DRAPEAU, J.—The parties to this action are brothers. The plaintiff, William, alleges in his complaint that he is the owner and entitled to possession of a parcel of realty in Los Angeles; that defendant wrongfully entered and ousted him, took possession of the property and asserts an adverse interest therein which claim is without right.

By his answer, defendant alleges sole ownership of the property in him, and denies that plaintiff has any right, title or interest thereto.

Upon the issues framed by the pleadings, and an affirmative answer to the following interrogatory presented to it, the jury returned a verdict in favor of plaintiff and assessed his damages at $2,500:

"Did Theresa Patton and Otto Patton on or about February 2, 1942, sign and deliver to plaintiff, William P. Von Hesseln, a grant deed to certain improved real property (describing it) generally known and referred to as premises 1914 Clinton Street, Los Angeles, California, in which deed said William P. Von Hasseln was named as grantee?"

From the judgment which follows, defendant appeals.

The following grounds are urged for a reversal:

(a) Proof of the contents of the alleged deed to plaintiff should not have been admitted as evidence;

(b) There is not sufficient evidence of delivery of the alleged deed or of intent to deliver it to sustain the judgment;

(c) There was insufficient evidence as to the contents of the alleged deed to sustain the judgment;

(d) Other errors which were prejudicial to defendant.

In 1942, Theresa Patton, mother of the parties hereto, and Otto Patton, their stepfather, owned two parcels of real property, one in Santa Ana and the other in Los Angeles.

The latter, known as the Clinton Street property, is the subject of this suit. On February 2, 1942, the Pattons deeded the Santa Ana property to defendant. And plaintiff asserts that they deeded the Clinton Street property to him on the same date but he did not record the deed.

Mrs. Patton died on June 3, 1950, and Otto Patton died on September 11, 1950. Before he died, to wit: on June 19, 1950, Mr. Patton deeded the Clinton Street property to defendant. This deed was recorded on August 16, 1950.

Plaintiff testified that he had a conversation with his mother and his stepfather in January of 1942 when they told him "that Gus wanted to go ahead and build up the business down in Santa Ana and that they were getting too old, that they couldn't afford to let him get a note on that property and in their name, that they were going to ask me if it would be all right to deed the property to him so he could get his own loan, assume his own debt, if they would leave me this place 'so we could have an even division made to be right with

both of you boys.' . . . Mother Patton . . . was telling me what they had decided 'and would that be agreeable to you,' and I said, 'Well, he would be getting the benefit of the doubt.' I says, 'After all, I wouldn't be getting any of this until after you folks died. However, I am working and I don't need the money, so it would be all right with me.' . . . they had to live on the income, you know, and still live in the house, too. So they says, 'Yes, it is kind of one-sided now.' That is the reason they were asking me if it was agreeable. . . . I said it would be. . . . when they delivered the deeds to them they come up and brought one of them to me. . . .

"Q. What kind of a deed was it? A. A grant deed to the property.

"Q. Are those the words you saw on the instrument? A. That is what I thought it was.

"Q. Now, do you recall whether it bore a date? A. Well, it was right after, about a month or so after the first conversation. . . . February, I believe, of 1942. Q. At the beginning? A. Yes. Q. And do you recall anything else? Did you examine this document which they delivered to you? A. I just glanced at it. Q. What did you see in it when you looked at it? A. . . . Just 'Block something, Lot 5, Lot 3,' something like that. Q. Lot 5 and Lot 3? A. No, Lot 4, I believe, Block 3, something like that. Q. Lot 4 and Lot 5 in Block 3? A. Something like that. Q. Did you see anything else on that deed? A. Well, the seal. I know there was Mr. William Letts' name. Q. That was on the other side? Did you see your name on that instrument? A. Yes, sir. Q. And did you see your mother and your father's name on that instrument? A. Yes, sir. Q. And did you see any signatures on that instrument? A. I believe there was a witness of some sort. Q. Did you see either your mother or your father's signatures on that instrument? A. Yes, sir, both of them. Q. You saw them there? A. Yes. . . . It was a printed form with typing on it. . . .

"Q. Mr. Von Hesseln, when they delivered this deed to you, what did you do with it. A. I put it in the safe that we all use in their house for safety and all the important papers, like insurance papers and all, we always put it in there in case of fire. Q. Where did you say you put it? A. In their safe. . . . Mr. Patton's old safe he had. He never locked it, but it was there in the house and always closed but not locked, you could just open it up and look in. Q. Did you have a

cubicle or a box in that safe? A. Yes, sir. Q. And did you keep other documents and valuables in there? A. Yes sir. . . . Insurance papers, and some cash, and I think I had a hundred silver dollars saved up at the time, just for the fun of it. . . . Q. Do I understand you to say that you took this deed and put it in that cubicle where you had your other papers? A. Yes. Q. Did you ever have this deed recorded? A. Never had it recorded.''

Plaintiff also testified that he and his wife moved into an apartment on the Clinton Street property in 1948. They looked for a house and intended to buy one. His mother asked him ''What do you want to buy a house for? . . . You have got one now, you have got two.'' There were two houses on the property and seven or eight tenants. Mr. Patton took him around and introduced him to the tenants. He said, ''I want you to meet the new landlord.'' Plaintiff lived on the property for about two years during which he had occasion to look in the safe many times. He could see what was in his box and thought the deed was still there.

In May of 1950, plaintiff's mother became ill and defendant took her to Santa Ana. Just before she died on June 3d, defendant telephoned plaintiff and told him that he was bringing their mother back to the Clinton Street house with a nurse; that there would not be room for all of them, and told plaintiff to ''get out right now.'' Plaintiff and his wife moved to a hotel.

Later when plaintiff tried to see his stepfather, defendant always came to the door and told him that Mr. Patton did not want to see him. Plaintiff was in the house only once after his mother died. That was when he went ''to find out whether my papers were in the safe and he (defendant) said, 'No, nothing was in the safe . . . there was nothing there.' ''

Neither brother told the other that he had a deed to the Clinton Street property.

On cross-examination, in reply to the question: ''Now, after you said this deed was handed to you, did you regard that as your property?'', plaintiff stated: ''I did.''

In an attempt to impeach the testimony of plaintiff, he was interrogated on cross-examination about another action filed by him and later dismissed. That was to cancel the deed from Otto Patton to defendant. It contained allegations referring to a will made by the Pattons in which plaintiff was named their sole heir.

On redirect examination, plaintiff explained that when he learned of the allegation referring to a will, he told his attorney that was a mistake; instructed him to dismiss that suit and file the instant action. Again at the behest of his counsel he testified:

"Q. Now, Mr. Von Hesseln, Mr. Tilson keeps referring to a paper of some kind that you received in February of 1942. Do you know what that paper was that you received at that time? A. Yes, sir.

"Q. What was it? A. Grant deed.

"Q. Do you know who the grantors were in that instrument? A. Yes, Sir.

"Q. Who were they? A. Otto Patton and Theresa C. Patton.

"Q. Do you know who the grantee was in that deed? A. Yes.

"Q. Who was it? A. I.

"Q. Your name appeared there as grantee? A. Yes, sir.

"Q. Was it signed by your mother and stepfather? A. Yes, sir.

"Q. Was it acknowledged before a notary public? A. It was.

"Q. And that notary public's name was what? A. William Letts.

"Q. That document, that grant deed, was delivered to you, was it not? A. Yes.

"Q. At your home? A. Yes, sir.

"Q. By Otto Patton? A. And mother.

"Q. Mother Patton? A. Yes, sir.

"Q. And subsequently you took it over to the Patton house . . . And you placed it in a cubicle in a safe in that house which was reserved for you? A. That is right.

"Q. And on a number of occasions after that time you went to that safe to put things in and take things out, is that correct? A. That is right.

"Q. And on some of those occasions did you see this grant deed? A. Yes, sir.

"Q. Now, did your brother ever at any time tell you until after Otto Patton's death that Otto Patton had deeded this property to him? A. No, he did not.

"Q. In fact, when you learned for the first time of that deed you then went to see your attorney. . . . And because Mr. Pollack was not there you talked to the young lady that was there, is that correct? A. That is right.

"Q. Did you at that time tell either Mr. Pollack or Vivian

Feld that Otto Patton had left a will in which he left everything to you as his sole heir? A. No.

"Q. Did you ever tell Mr. Pollack or Miss Feld that you were the sole heir at law of Otto Patton? A. No."

Defendant testified that after the death of Otto Patton in September of 1950, he told plaintiff that he had a deed to the Clinton Street property. And that plaintiff said: " 'Why, this place is supposed to belong to me.' I told him, 'If you have any papers, Bill, that would show in any way that you are entitled to this property, you don't have to ask me to get off here, I will get off, because it belongs to you and we will be perfect friends.' "

The witnesses Bishop and Bowen both testified to conversations they had with Otto and Theresa Patton in which the latter stated they had decided to divide their property between the plaintiff and the defendant, and that they had deeded the Clinton Street property to the plaintiff.

It was stipulated at the trial that William Letts, the notary public, whose name and seal plaintiff testified appeared on the grant deed here in question, was dead, and that if his wife were called, she would testify that he died August 24, 1949, and that since his death his notarial records had been destroyed.

As was stated by this court in the recent case of *Massow* v. *Gianaclis*, 120 Cal.App.2d 24, 27 [260 P.2d 655]: "The rule as to our province is: 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pac. Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].)"

Respondent bases his claim to the property in question upon a purportedly lost instrument. And, as stated in *Murray* v. *Guarantee Trust etc. Bank*, 79 Cal.App. 69, 76 [248 P. 1039]: "It is the rule that in order to establish the execution and contents of a lost instrument it is necessary that the evidence be clear, satisfactory, and convincing; but, as in actions to

prove a trust by parol, whether the evidence in any particular case is of that character must be left largely to the trial court; and where there is substantial evidence supporting its finding its determination thereon must be accepted as conclusive on appeal (*Sherman* v. *Sandell,* 106 Cal. 373 [39 Pac. 797]; *Harris* v. *Harris,* 136 Cal. 379 [69 Pac. 23]; *Bollinger* v. *Bollinger,* 154 Cal. 695 [99 Pac. 196])." See, also, 16 California Jurisprudence 703, section 13, where it is said: "While the parol evidence should be clear and certain, it is not necessary that the witness state the contents (of a lost instrument) with verbal accuracy, the substance being all that is required."

Appellant's main contention appears to be that respondent's recollection of the facts which he testified to "after having had a glance at the instrument is not just inherently improbable but absolutely impossible. . . .''

Upon that subject the late case of *Evje* v. *City Title Ins. Co.,* 120 Cal.App.2d 488, 492 [261 P.2d 279], has this to say: " 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category (citation). To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. (Citations.) Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (Citations.)' (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758]; *Kircher* v. *Atchison, T. & S. F. Ry. Co.,* 32 Cal.2d 176, 183 [195 P.2d 427]; *Cox* v. *City of Los Angeles,* 100 Cal.App.2d 378, 381 [223 P.2d 868].)'' See, also, *Postier* v. *Landau,* 121 Cal. App.2d 98, 101 [262 P.2d 565].

While it is true that respondent said he "glanced" at the deed, he further testified that he *saw* the contents; that his name appeared therein as grantee; that it was signed by the Pattons and that it was acknowledged before a notary public whose name was William Letts. Although he was not completely sure of the legal description of the property, he testified that it was described in the deed as "also known as 1914 Clinton Street."

■ Delivery or nondelivery of a deed "is a question of fact to be determined by the surrounding circumstances of the transaction and where there is substantial evidence or where an inference or presumption may be drawn from the evidence to sustain the court's finding of delivery such finding will not be interfered with on appeal." *Chaffee* v. *Sorensen,* 107 Cal.App.2d 284, 288 [236 P.2d 851].

■ The evidence as revealed by the above résumé is amply sufficient to sustain the verdict of the jury and the judgment.

■ Appellant also urges that the following instruction was erroneously given because it would give respondent a reasonable rental value of the premises from about June 4 or 5, 1950, until time of trial:

"If under the Court's Instructions you find for the plaintiff you will assess the amount of his damages. The measure of said damages is the reasonable rental value of said property during the period possession thereof was withheld from plaintiff by the defendant. Given on Court's own motion."

It is contended that, since respondent conceded the Pattons' right to possession of the property during their lives, no dispossession could take place until the death of Otto Patton on September 11, 1950.

We agree that such damage should have been assessed from September 11, 1950, instead of from June 5, 1950, until the time of trial.

The cause is remanded to the trial court for reassessment of damages in accordance with the views herein expressed. Otherwise, in all other respects, the judgment is affirmed. Each party shall bear his respective costs of appeal.

White, P. J., and Doran, J., concurred.