**CENTURY INDEMNITY COMPANY, as successor to CCI Insurance Company, as successor to Insurance Company of North America, One Beacon Insurance Company, and Continental Insurance, Plaintiffs/Counterclaim–Defendants,**

v.

**AERO–MOTIVE COMPANY, Aero–Motive Manufacturing Company, William Becker, and Roger Becker, Defendants/Counterclaim–Plaintiffs.**

No. 1:02–CV–108.

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 18, 2003.

John M. Stuart, State Public Defender, Cathryn Middlebrook, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Jon Earl Quick, Bayport, MN, Appellant Pro Se.

Mike Hatch, Attorney General, State of Minnesota, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN, Susan Rantala Nelson, Norman County Attorney, Ada, MN, for Respondent.

## OPINION

QUIST, District Judge.

Plaintiffs Century Indemnity Company ("Century") and One Beacon Insurance Company ("One Beacon") filed this action seeking a declaration that they are not obligated to Defendants, Aero–Motive Company, Aero–Motive Manufacturing Company, William Becker, and Roger Becker (collectively "Aero" or "Defendants"), under certain insurance policies they allegedly issued and that they are not obligated to satisfy a consent judgment among Defendants. Subsequently, Continental Insurance ("Continental") moved to intervene as a plaintiff in the case based upon claims by Defendants for coverage under an insurance policy allegedly issued by Continental. Now before the Court are the parties' cross motions for summary judgment regarding the issue of lost insurance policies. Also before the Court is Continental's motion to exclude the testimony of Aero's expert, in which Century and One Beacon have joined, and Century's request for sanctions against Defendants for failing to timely produce documents.

## I. Background

### A. Underlying Factual Basis and Related Actions

Defendant Aero–Motive Manufacturing Company ("Aero I"), was formed in approximately 1939 by the father of Defendants William Becker and Roger Becker (the "Beckers"). During its existence, Aero I manufactured cable and hose reels. The Beckers assumed control of Aero I around the time of their father's death in 1960. The Beckers owned and operated Aero I until 1972, when they sold it to Kalaco, Inc., a subsidiary of the Daniel Woodhead Company. Kalaco, Inc. later changed its name to Aero–Motive Manufacturing Company ("Aero II"). In 1992, Aero II removed an underground storage tank it had installed in 1974 and discovered that some leakage had occurred in a limited area around the tank. When Aero II took action to remediate the contaminated soil, it discovered additional contamination under a warehouse. Further investigation revealed that the contamination had affected an area one mile down gradient from the property. Aero II undertook additional efforts and incurred additional costs to clean up the contamination. In August 1995, Aero II notified the Beckers of their potential liability for the contamination.

From January 19, 1964, to January 19, 1965, Aero I was insured under Policy No. LAB 16925, issued by Century's predecessor, Insurance Company of North America ("INA"). From July 1, 1965, to July 1, 1968, Aero I was insured under Policy No. CBP 40559, issued by Continental. From July 1, 1968, to July 1, 1971, Aero I was insured under Policy No. A 13 40007–31, issued by One Beacon's predecessor, American Employers ("American"). American also issued Policy No. AD

40018–13 for the period, July 1, 1971 to July 1, 1974, which was cancelled on July 1, 1972, after the Beckers sold the company to Kalaco, Inc.[1] During the time these policies (the "Primary Policies") were in effect, Aero I was also insured under excess umbrella liability policies issued by INA (the "Excess Policies"). Those policies were as follows: (1) Policy No. XBC 5224, which provided coverage from August 11, 1964, to August 11, 1967; (2) Policy No. XBC 60741, which provided coverage from August 11, 1967 to August 11, 1970; and (3) Policy No. XBC 76888, which provided coverage from August 11, 1970 to August 11, 1973.

In 1999, Aero II filed suit against the Beckers, alleging that they were liable to Aero II under federal and state law for clean-up costs (the "1999 Aero II suit"). The Beckers notified Century and One Beacon of the lawsuit. Century agreed to fund 40% of the Beckers' defense costs, subject to a reservation of rights. In 2001, Aero II filed suit against Aero I (the "2001 Aero II suit") for recovery of the clean-up costs at issue in the 1999 Aero II suit. Century agreed to fund all of Aero I's defense costs in the 2001 Aero II suit, subject to a reservation of rights.

On February 7, 2002, a settlement conference was held in the 1999 Aero II suit. Counsel for Aero II, Aero I, the Beckers, Century, and One Beacon attended the conference. During the settlement conference, and without any advance notice to Century or One Beacon, counsel for Aero II, Aero I, and the Beckers signed and filed a consent judgment in the 1999 Aero II suit in the amount of $5 million. Pursuant to the terms of the consent judgment, the Beckers agreed to pay $100,000 and Aero II agreed to seek the balance from Aero I's and the Beckers' insurers, including Century and One Beacon. After rejecting an initial draft of the parties' consent judgment, this Court signed a revised version of the consent judgment, but informed counsel for Aero II, Aero I, and the Beckers that the consent judgment would be binding only on the parties and not on the insurers.

## B. The Present Action

Century and One Beacon filed this action one day after the Court entered the consent judgment. As noted above, Century and One Beacon sought in their complaint, among other things, a declaration that they are not obligated to Aero under their respective policies and that they are not bound by the consent judgment. Subsequently, Aero obtained writs of garnishment against the insurance companies in order to collect on the consent judgment. In response, Century and One Beacon moved to stay the garnishment proceeding and to quash Aero's notices of deposition and subpoenas. Aero then moved the Court to stay this action and to allow the insurers' liability to be determined in the garnishment proceeding. On June 26, 2002, the Court entered an Order denying Aero's motion to stay this case and granting Continental's motion to intervene as a plaintiff. On June 27, 2002, the Court entered an Order granting Century and One Beacon's motion to stay the garnishment proceeding in the 1999 Aero II case. Aero II appealed that Order, and the appeal has since been dismissed.

Aero has retained Douglas L. Talley ("Talley") of Risk International Services, Inc. ("RIS") as an expert witness on reconstruction of lost insurance policies. Talley received his law degree in 1984 and, after working in private practice for three years,

---

1. The insurers do not dispute that the evidence establishes that these policies were actually issued to Aero I.

joined RIS in 1987. During his fifteen years of employment with RIS, Talley has assisted clients in negotiating settlements with insurers, including in cases involving a lost or missing insurance policy. (Talley 10/3/02 Aff. ¶ 3 Defs.' Br. Resp. Pl. Continental's Mot. Exclude Testimony Ex. A.) In connection with his work, Talley has reviewed thousands of commercial policies and insurance industry forms, including many comprehensive general liability policies from the period 1964 to 1972. (*Id.*) Talley has also provided risk management services to corporate clients by assisting them in submitting underwriting applications for commercial insurance policies. (*Id.* ¶ 5.) Talley states that during the course of his work at RIS, he has become familiar with commercial underwriting practices and procedures and has reviewed and analyzed general liability forms used by insurance companies in order to determine coverage historically offered in the insurance market. (*Id.* ¶ 6.) Talley has been quoted on insurance reconstruction matters in industry journals and publications; has testified before governmental and regulatory agencies; has spoken on the subject of insurance reconstruction at seminars and conferences; and has been retained by the states of California and Washington to provide insurance reconstruction services.

Pursuant to the Court's June 26, 2002, Order, the parties have filed cross motions for summary judgment regarding Plaintiffs' evidence pertaining to insurance policies issued by Century/INA, One Beacon/American, and Continental. The parties do not dispute that: (1) Century/INA Policy No. LAB 16925, Continental Policy No. CBP 40559, and One Beacon/American Policy Nos. A13 40007–31 and AD 40018–13 were actually issued to Aero I; (2) those policies are missing through no fault of Aero; and (3) Aero has made a good faith effort to locate those Policies. The question presented is whether Aero

can present sufficient evidence of the terms of the lost policies to proceed on its claims against the insurers. In connection with the motions for summary judgment, Continental has filed a motion to exclude Talley's expert testimony pursuant to Federal Rule of Evidence 702.

## II. *Discussion*

### A. Motion to Exclude Talley's Testimony

In its motion to exclude Talley's testimony, Continental argues, among other things, that Talley is not qualified to give expert testimony and that Talley's testimony does not meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

█ A preliminary question under Rule 702 is whether the proffered expert possesses sufficient qualifications through knowledge, skill, training, or experience to assist the trier of fact to understand the evidence or to determine a fact in issue. This requirement is met where the witness' qualifications provide a foundation for the witness to answer a specific ques-

tion. *See Berry v. City of Detroit,* 25 F.3d 1342, 1350 (6th Cir.1994). Although Continental does not raise the issue directly, Continental suggests that Talley is not qualified to render opinions relating to reconstruction of the lost insurance policies because he has never been employed in the insurance industry or for an insurance regulatory body; he does not have any insurance degrees or designations, such as a Chartered Property Casualty Underwriter designation; he has no faculty appointments; and he has no affiliations with any professional organizations other than bar associations. The lack of such credentials does not prevent Talley from being qualified as an expert, because experience alone may be sufficient to qualify a witness to give expert testimony. *United States v. Kunzman,* 54 F.3d 1522, 1530 (10th Cir. 1995); *see also Hamilton v. Emerson Elec. Co.,* 133 F.Supp.2d 360, 367 (M.D.Pa.2001) ("To be sure, witnesses can qualify as experts under Rule 702 on the basis of practical experience alone, and a formal degree, title, or educational specialty is not required."). Here, Aero has demonstrated that Talley has significant experience in commercial insurance underwriting practices and has an historical knowledge of forms used and coverages offered in the commercial insurance industry. More importantly, Talley has performed insurance reconstruction services for clients in cases involving lost insurance policies.[2] The statements in Talley's affidavit regarding his prior insurance reconstruction services thus refute Continental's argument that Talley lacks expertise in the reconstruction of insurance policies. Therefore, the Court concludes that Talley's experience is sufficient to qualify him to give expert testimony in this case.

■ Continental also asserts that Talley should be precluded from testifying because the analysis he performed in reaching his conclusions is no different than the analysis employed by the attorneys for the parties or the analysis the Court will engage in to decide the pending motions. This argument must be rejected, because Federal Rule of Evidence 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Thus, a district court may admit "opinion testimony if the expert's specialized knowledge is helpful to the jury to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the jury." *United States v. Brown,* 110 F.3d 605, 610 (8th Cir.1997). Testimony should be excluded, however, where it amounts to a legal conclusion or merely tells the jury what result to reach. *Berry,* 25 F.3d at 1353–54; *Elsayed Mukhtar v. Cal. State Univ.,* 299 F.3d 1053, 1065 n. 10 (9th Cir. 2002). Based upon its review of Talley's affidavit, the Court concludes that the opinions Talley offers in this case pertain to issues of fact rather than conclusions of law. Because Talley's testimony is based on experience not possessed by the ordinary person, his testimony will assist the trier of fact as required by Rule 702 and will not impermissibly impinge on the role of the Court or the jury. However, the Court will not permit Talley to give legal conclusions and will not consider any opinions constituting a legal conclusion in deciding the instant motions for summary judgment.

■ Continental's primary argument is that Talley's testimony is not reliable. In

---

**2.** Talley also states that he has testified as an expert witness on insurance reconstruction, insurance analysis, and insurance claim re-

covery in five previous cases. (Talley 10/3/02 Aff. ¶ 12.)

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court addressed the admissibility of expert testimony based upon scientific knowledge. The Court explained that in determining whether to admit expert testimony, a trial court must act as a gatekeeper under Rule 104(a) and examine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. at 2796. In performing this function, the trial court must first determine whether the subject of the expert's proposed testimony has a scientific basis, i.e., is it "supported by appropriate validation." *Id.* at 590–91, 113 S.Ct. at 2795. If so, the court must then determine whether the testimony is relevant— does it "fit" the facts in issue? *Id.* at 591–92, 113 S.Ct. at 2795–96. To assist courts in determining whether the expert's reasoning or methodology is scientifically valid or reliable, the Court identified a non-exhaustive list of non-dispositive factors that might provide guidance: (1) whether the theory or methodology has been or can be tested; (2) whether it has been subjected to peer review; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted in the scientific community. *Id.* at 593–94, 113 S.Ct. at 2796–97.

In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court considered whether the analysis in *Daubert* for determining the admissibility of expert testimony based upon scientific knowledge also applied to determining the admissibility of expert engineering testimony based upon "technical" or other specialized knowledge. The Court held that a trial court's gatekeeping function under Rule 702 applies to *all* expert testimony, regardless of the basis of the expert's knowledge. *Id.* at 147–49, 119 S.Ct. at 1174–75. Thus, regardless of the type of expert testimony at issue, the trial court must still ensure that the expert's proposed testimony is both "reliable and relevant." *Id.* at 149, 119 S.Ct. at 1174. With regard to the specific factors identified in *Daubert,* the Court concluded that a trial court considering expert testimony based on knowledge other than scientific knowledge may consider some or all of those factors in determining whether the proposed expert testimony is reliable. *Id.* at 149–50, 119 S.Ct. at 1175. The Court stressed, however, that the test of reliability under Rule 702 is a "flexible" one, and application of the *Daubert* factors in a particular case may or may not be appropriate, depending on the nature of the particular testimony. *Id.* at 141, 150–51, 119 S.Ct. at 1171, 1175–76. Thus, in certain cases, all of the *Daubert* factors may be helpful to the court's inquiry, while in other cases where reliability derives solely from the personal knowledge or experience of the witness, the factors may not be helpful at all. *Id.* at 150, 119 S.Ct. at 1175.

The Sixth Circuit has recognized that while the *Daubert* factors may be helpful in some cases, they "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r,* 272 F.3d 333, 339 (6th Cir. 2001). For example, in *First Tennessee Bank National Association v. Barreto,* 268 F.3d 319 (6th Cir.2001), the Sixth Circuit concluded that the *Daubert* factors were not helpful in determining the admissibility of an expert's testimony regarding whether the plaintiff followed prudent banking practices. The court reasoned that because the basis of the expert's testimony was his "own practical experiences throughout forty years in the banking industry," his opinions were not of a type that "lend themselves to scholarly review or to traditional scientific evaluation." *Id.*

at 335. Still, in all cases, a district court must confirm that "the factual underpinnings of the expert's opinion [are] sound." *Greenwell v. Boatwright,* 184 F.3d 492, 498 (6th Cir.1999).

The Court concludes that the *Daubert* factors are not helpful in assessing reliability in this case because Talley's opinions, which are based upon his experience in reconstructing lost insurance policies, are not the type of opinions that can be tested or verified or subjected to peer review. Talley's testimony is more analogous to the expert testimony at issue in *First Tennessee Bank* where the basis for the expert's opinion was his "own practical experiences throughout forty years in the banking industry." *First Tenn. Bank,* 268 F.3d at 335. Thus, Continental's arguments that Talley's opinions cannot be tested, verified by standards or controls, or subjected to peer review, are not bases for exclusion of Talley's testimony. Moreover, Aero has adequately demonstrated that reconstruction of missing insurance policies is an area that has gained general acceptance. In fact, insurance reconstruction experts have been permitted to testify in other lost policy cases. *See, e.g., Coltec Indus., Inc. v. Zurich Ins. Co.,* No. 99 C 1087, 2002 WL 31185789, at *9 (N.D.Ill. Sept. 30, 2002); *Star Oil Co. v. Aetna Cas. & Sur. Co.,* No. 93–CV–72686, 1995 WL 875597, at *4 n. 4 (E.D.Mich. June 14, 1995).

■ Continental also asserts that the factual basis for Talley's opinion with regard to the Continental policy is unreliable because Talley has not produced the documents he relied upon in forming his opinions. However, Aero points out that the documents that Talley considered have been produced to Continental. Therefore, Continental is free to cross-examine Talley regarding those documents. Finally, Continental asserts that Talley's analysis cannot withstand scrutiny because Talley concludes, without any basis, that the Form 600 produced by Continental was the form actually used in the Continental policy. This argument goes to the weight of Talley's testimony rather than its admissibility. As the Sixth Circuit has observed, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Avery Dennison Corp. v. Four Pillars Enter. Co.,* 45 Fed.Appx. 479, 483–84 (6th Cir.2002) (citing *Daubert* ).

**B. Plaintiffs' Motions for Summary Judgment**

**1. Summary Judgment Standard**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

**2. Standard for Proof of a Lost Insurance Policy**

■ Under Michigan law, an insured seeking to enforce an insurance policy has the burden of proving the existence and

terms of coverage in the policy. *See S. Macomb Disposal Auth. v. Nat'l Sur. Corp.*, 239 Mich.App. 344, 353–54, 608 N.W.2d 814, 819 (2000) (per curiam) (citing M.C.R. 2.112(D)). In the case of a lost policy, the insured must still prove the existence of coverage and the terms and existence of that coverage by a preponderance of the evidence. *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1020 (6th Cir.1995); *Star Oil Co. v. Aetna Cas. & Sur. Co.*, No. 93–CV–72686, 1995 WL 875597, at *3 (E.D.Mich. June 14, 1995); *Cello–Foil Prods., Inc. v. Mich. Mut. Liab. Co.*, No. 151615, 1995 WL 854728, at *5 (Mich.Ct.App. Aug. 15, 1995) (per curiam). If the insured can demonstrate that the loss or destruction of the policy was not the result of bad faith, the insured may introduce circumstantial or secondary evidence to meet its burden of proof. *Americhem Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.Supp. 1143, 1144–45 (W.D.Mich.1995) (citing Fed. R.Evid. 1002, 1004). To sustain its burden in a "lost policy" case, an insured must present secondary evidence establishing both the issuance and terms of the policy, including the named insured; the period of coverage; the types of coverage; and the limits of coverage. *See LeVere v. Aetna Cas. & Sur. Co.*, 208 Mich.App. 622, 623–24, 528 N.W.2d 838, 839 (1995) (per curiam). Secondary evidence may include documentary evidence, such as binders and declarations pages, testimony from insurance agents or brokers responsible for obtaining insurance for the insured, testimony from representatives of the insurer, insurance policy reconstruction experts, and standard policy forms in use by the insurer during the relevant period. *See Americhem*, 942 F.Supp. at 1145–46; *Star Oil Co.*, 1995 WL 875597, at *3–7. While a copy or a reasonable facsimile of the policy is not an absolute requirement for an insured to establish coverage, an insured cannot meet its burden merely by

"rely[ing] on some contemporaneous version of the policy that it has secured from [the insurer or] other parties ... absent some clear link, such as there being only one version of the policy, direct testimony linking the sample policy to the one issued, or solely cosmetic differences between versions." *Harrow Prods., Inc.*, 64 F.3d at 1021. In other words, the evidence must allow more than mere speculation regarding the terms and existence of coverage. *Star Steel Supply Co. v. United States Fid. & Guar. Co.*, 186 Mich.App. 475, 481, 465 N.W.2d 17, 20 (1990) (per curiam).

Aero has presented evidence showing that Aero II, Aero I, and their current and former representatives have conducted an exhaustive search of their records in order to locate the policies. In addition, Aero and its attorneys have interviewed representatives of the Garrett Agency, which handled Aero I's insurance during the relevant period, and Aero II's current insurance broker, Arthur J. Gallagher. Finally, Aero has subpoenaed Plaintiffs for documents relating to the policies, but Plaintiffs were unable to locate any such documents. There is no dispute between the parties that the policies are lost. Moreover, Aero's evidence shows, and Plaintiffs do not dispute, that Aero has not acted in bad faith. Therefore, the Court must determine whether Aero has presented sufficient secondary evidence to prove the terms of the policies.

### 3. Summary of Aero's Evidence

#### a. Century/INA Policies LAB 16925 and 16994

Aero presents the following evidence to establish the existence and terms of Policy No. LAB 16925:

i. The Schedule of Underlying Policies in INA Excess Policy XBC 5224 (Schedule A), which lists INA Policy No. LAB 16925 as providing comprehensive liability for the period

1/19/64 to 1/19/65. The schedule also indicates that the policy contained several coverages, including property damage liability with limits of $25,000 per accident and a $25,000 aggregate for products liability. (Schedule A, Talley Aff. Ex. 4 at 2, Defs.' Br. Supp. Ex. B.)

ii. Correspondence from Century's counsel dated February 28, 2002, which states "that Century does not contest that it issued INA Policy No. LAB 16925." (Letter from Cohn to Denton of 2/28/02, Talley Aff. Ex. 2.)

iii. Deposition testimony by William Richardson, a representative of Century, that LAB policies always contained general liability and automobile liability coverages. (Richardson Dep. at 17, Defs.' Reply Br. Pl. Century's Mot. Ex. B.)

iv. The affidavit of Aero's insurance reconstruction expert, Talley. Talley states that general liability insurance policies issued by insurance companies during the 1964 to 1972 time period contained "boiler-plate" language adopted from National Bureau of Casualty Underwriters ("NBCU") or Insurance Rating Board ("IRB") forms. Talley notes that during the mid–1960s, INA wrote policies on a manuscript basis, i.e., a non-standard policy based upon the individual needs of the insured, rather than based upon specimen or standard policies. However, Talley states that the "material terms" of the LAB policy commonly incorporated language from standard industry forms and usage and the material terms of Policy No. LAB 16925 can be reconstructed with reasonable certainty. Based upon his review of the schedule of underlying primary policies contained in the INA excess policy; his review of INA LAB Policy No. 13200, issued to Sun Oil Company for the period 10/1/62 to 10/1/65, and a copy of an INA LAB manuscript policy worksheet; and his review of Aero's other evidence, Talley opines that LAB Policy No. 16925:(1) contained property damage coverage written on an "accident" basis rather than an "occurrence" basis; (2) contained a provision for defense of suits which provided that defense costs were in addition to the applicable limit of liability; and (3) did not contain a pollution exclusion clause. (Talley Aff. ¶¶ 10a–l.)

 In addition to the evidence described above, in its reply brief to Century's cross-motion for partial summary judgment, Aero submitted copies of prepaid insurance ledgers maintained by Aero I for the period 1964–1966.[3] (Prepaid in-

3. The ledgers for 1964–1966 are in addition to ledgers for 1968–1972 produced by Aero prior to the filing of the motions for summary judgment. Aero initially cited the 1964–1966 ledgers in its reply brief to rebut the assertion by Century that Aero I may have had a lapse in coverage between the last day of INA Policy No. LAB 16925 and the first day of the policy period for Continental Policy No. CBP 40559. Aero has since indicated that it is seeking to amend its complaint to conform to the evidence pursuant to Fed.R.Civ.P. 15(a), to add a claim for coverage under LAB Policy 16994. Century contends that the Court should not consider the ledger sheets because they are cumulative of the undisputed fact that Century issued Policy No. LAB 16925 and because Aero has not laid any foundation for them. The Court rejects Century's arguments. First, the ledger sheets are not entirely cumulative. Those documents show that Aero I had continuous coverage between the period of January 19, 1964, to July 1, 1965. Second, Aero has laid a sufficient foundation for admission of the ledger sheets as business records under Fed.R.Evid. 803(6). A docu-

surance ledgers, Defs.' Reply Br. Pl. Century's Mot. Ex. A.) Aero maintained that the ledgers were discovered during a search for documents in response to Plaintiffs' document request served in August 2002. Aero offered the ledgers: (1) as additional evidence supporting the issuance of Policy No. LAB 16925; and (2) as evidence of the issuance of Policy No. LAB 16994, which Aero contends INA issued following the cancellation of Policy No. LAB 16925 in January 1965. Aero asserts that the ledger shows that Policy No. LAB 16994 was in effect for the period January 1, 1965, to July 1, 1965, and bridged the gap between Policy No. LAB 16925 and Continental Policy CBP No. 40559, which became effective July 1, 1965.

### b. Continental Policy CBP No. 40559

Aero relies on the following evidence to establish the terms and existence of Continental Policy No. CBP 40559:

i. Endorsement 4 to the Schedule of Underlying Policies in INA Excess Policy XBC 5224, which amended the schedule to provide that Policy No. CBP 40559 became the primary policy effective July 1, 1965. Endorsement 4 indicates that Continental Policy No. CBP 40559 provided comprehensive liability coverage from 7/1/65 to 7/1/66, with property damage limits of $100,000 for each accident and a $100,000 aggregate for product liability claims. (Endorsement 4, Talley Aff Ex. 4 at 16.)

ii. A property insurance binder dated December 8, 1967, stating that the risk is "covered under Policy # CBP40559 of the Continental Insurance Company and subject to all the terms and conditions of same." (12/8/67 Binder, Talley Aff. Ex. 11.)

iii. Aero I corporate ledger sheets regarding pre-paid insurance premiums. The ledgers describe Aero I's insurance coverages from 1965 to 1968 and specifically reference Continental Policy No. CBP 40559. (Ledger sheets, Talley Aff Ex. 10.)

iv. Deposition testimony from Continental representative Robert Gethard ("Gethard") that the CBP prefix indicated that the policy was a Continental business package policy. (Gethard dep. at 22–23, Defs.' Br. Supp. Ex. J.) Gethard also testified that CBP policies were always based on standard Form 600 or one of its revisions. (*Id.* at 48–49.)

v. The Talley affidavit, in which Talley concludes that Continental issued a comprehensive business insurance policy, No. CBP 40559, to Aero I for the period July 1, 1965, to July 1, 1968. Talley also concludes that the

ment may be admitted as a business record if: "1) it was 'made in the course of a regularly conducted business activity,' 2) it was 'kept in the regular course of [ ] business,' 3) it was the result of a 'regular practice of the business' to create such documents, and 4) it was 'made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.' " *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quoting *United States v. Laster*, 258 F.3d 525, 529 (6th Cir.2001)). Aero has established these requirements through the testimony of Roger Becker, the former president of Aero I, who testified that Aero I's account-

ing department was responsible for preparing the insurance ledgers and ensuring that the information in those ledgers was accurately recorded. (R. Becker Dep. at 28, Defs.' Supplemental Resp. Br. to Century's Supplemental Mem. Ex. A.) Roger Becker also testified that the ledger was the same type of ledger he recalled seeing when he was with Aero I. (*Id.* at 30.) Although Roger Becker's testimony was regarding the 1968–1971 ledgers, the 1964–1966 ledger sheets are of the same format as the 1968–1971 ledgers and the name Aero–Motive appears at the top of both sets of ledgers.

policy contained limits of $100,000 per accident for property damage and did not contain any type of pollution exclusion that would limit or restrict coverage for environmental contamination during the policy period as a result of an accident. (Talley Aff. ¶ 11.) Talley's conclusions are based upon his review of INA Excess Policy No. XBC 5224, including Endorsement 4 to the Schedule of Underlying Policies; Aero I ledger entries which reference payments made on Policy No. CBP 40559, providing blanket coverage, for the period July 1, 1965, to July 1, 1968; the insurance binder issued by the Garret Agency, which was specifically made a part of Continental Policy No. CBP 40559; policy segments of the CBP form used by Continental in the 1960s; and a copy of the general liability form, produced by Continental, that would have been incorporated in Policy No. CBP 40559. (*Id.* ¶¶ 11a.-f.)

**c. One Beacon/American Policy Nos. A13 40007–31 and AD 40018–13**

Aero relies on the following evidence to establish the existence and terms of Policy No. A13 40007–31:

i. The declarations page of Policy No. AD 40018–13, which states that the policy is a renewal of Policy No. A13 40007–31. (Talley Aff. Exs. 17, 18.)

ii. The deposition testimony of One Beacon representative Arthur T. Simmons, who confirmed that Policy No. AD 40018–13 was a Special Multi–Peril ("SMP") policy, which indicates that Policy No. A13 40007–31 was also a SMP policy. (Simmons Dep. at 30–31, Defs.' Br. Supp. Ex. K.)

iii. Schedule of Underlying Insurance of INA Excess Policy No. XBC 76888, which lists the underlying limits of coverage as $100,000 per occurrence and in the aggregate for property damage. (INA Excess Policy No. XBC 60741, Talley Aff. Ex. 16.)

iv. Aero I's ledger of pre-paid insurance, which evidences premium payments by Aero I for Policy No. A13 40007–31. (Ledger sheets, Talley Aff. Ex. 10.)

v. The Talley affidavit, in which Talley opines that there is sufficient evidence to establish the issuance of policy no. A13 40007–31. Talley also concludes that based upon the documents he has reviewed, including American Employers Policy No. AD 40018–13 and standard forms produced by One Beacon, that policy A13 40007–31 contained an agreement to pay all sums which Aero I became obligated to pay as damages because of property damage caused by an occurrence, with limits of $100,000. Talley also concludes that the policy did not contain a "pollution exclusion" that would limit or restrict coverage for environmental contamination caused by an occurrence during the policy period. (Talley Aff. ¶ 12.)

With regard to American Employers policy no. AD 40018–13, Aero presents the following evidence to establish the existence and terms of the policy:

i. A copy of the policy, including a declarations page. (Policy No. AD 40018–13, Talley Aff. Ex. 18.)

ii. Deposition testimony from Simmons, who stated that the copy of the policy leaves no question that the policy was actually issued. (Simmons Dep. at 47.)

iii. The Talley affidavit, in which Talley concludes that policy no. AD

40018–13 contained an agreement to pay on behalf of Aero I all sums which it legally became obligated to pay as damages because of property damage caused by an occurrence. In addition, Talley concludes that the policy limits were $100,000 for property damage per occurrence and in the aggregate, that the insurer had a duty to defend separate from the indemnity obligation, and that the policy did not contain a "pollution exclusion." (Talley Aff. ¶ 12e.)

#### 4. Sufficiency of Aero's Evidence

#### a. Century/INA Policy No. LAB 16925

 Century does not dispute that INA Policy No. LAB 16925 was actually issued to Aero I. In this regard, this case is distinguishable from some of the cases cited by Plaintiffs, in which the insured was unable to produce documentary or other evidence supporting the existence or issuance of an insurance policy. For example, in *Cello -Foil Products*, the court observed that the "plaintiff failed to produce documentary or other evidence showing a genuine issue of material fact regarding the existence of the . . . excess liability policy." 1995 WL 854728, at *5. Similarly, in *United States Fidelity and Guaranty Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139 (W.D.Mich.1988), the insured's evidence established that it purchased insurance from a company called "Continental," but the insurer presented evidence that there were several other insurance companies also using the name "Continental." *Id.* at 1171. In addition, prefixes used by the insurer to denote certain types of policies were also used by other insurance companies. *Id.* at 1172. The court concluded that the plaintiff failed to meet its burden of proving the existence and details of the policy. *Id.* Century, like the other

insurers, asserts that even though there is no dispute that the policy was issued, Aero's evidence is insufficient to establish the terms of the policy. Century, also like the other insurers, contends that Aero's evidence fails under the Sixth Circuit's decision in *Harrow Products, Inc.* As mentioned above, in that case the court stated that insured may prove the terms and conditions of an insurance policy without a copy of the policy or a reasonable facsimile of the policy, but described the insured's burden in such a case as "formidable." 64 F.3d at 1021. The court also observed that an insured may not "rely on some contemporaneous version of the policy that it has secured from [the insurer or] other parties . . . absent some clear link, such as there being only one version of the policy, direct testimony linking the sample policy to the one issued, or solely cosmetic differences between versions." *Id.*

The Schedule of Underlying Policies in INA Excess Policy No. XBC 5224 fleshes out some of the details of the INA primary policy. That exhibit, prepared by Century's predecessor, shows that Policy No. LAB 16925 provided comprehensive liability for the period January 19, 1964, to January 19, 1965, including property damage liability with limits of $25,000 per accident. The testimony of William Richardson ("Richardson"), a prior underwriter for Century, that LAB policies issued by INA always contained general liability and automobile liability coverages, further supports the conclusion that Policy LAB 16925 provided coverage for property damage with limits of $25,000 per accident. This evidence, which Century fails to contradict, establishes the basic elements of coverage: (1) the policy period; (2) the type of coverage (property damage); (3) the trigger of coverage for property damage ("accident"); and (4) the limit of liability ($25,000 per accident). The existence of such evidence distinguishes this case from

*Harrow Products,* where the insured's only evidence was a four-page, twelve-paragraph affidavit by a former employee which contained no evidence regarding the contents of the policies or the scope and amount of coverage, and which the court described as constituting "little more than [an] assertion [by the insured] that it had insurance." *Id.* at 1021.

The question, remains, however, whether Aero has presented sufficient evidence to meet its burden of establishing the material terms of the policy. For example, in *Star Oil Co.,* a case cited by Aero, the insured presented evidence through its expert that three different standard form policies used by the insurer during the period in question established the terms of the missing policies. 1995 WL 875597, at *7. Century argues that Aero cannot meet its burden with regard to Policy No. LAB 16925 because the lost policy is a "manuscript" policy rather than a "standard form" policy. Century argues that because a manuscript policy is nonstandard and may be modified by agreement of the parties, Aero cannot establish the terms of the policy because the provisions of a lost policy can only be established through a standard form policy. Century also points to Richardson's testimony that Century underwriters in the mid–1960s had almost complete discretion to deviate from the language of the LAB policy "tapes." (Richardson Dep. at 36.) However, Century cites no support for the proposition that the material terms of a manuscript policy cannot be established through the same type of evidence that may be used to establish the terms of standard form policies, and this Court's research indicates that other courts have not rejected an insured's efforts to prove the existence and terms of a lost policy solely because the lost policy was a manuscript policy. *See, e.g., Dart Indus., Inc. v. Commercial Union Ins. Co.,* 28 Cal.4th 1059, 124 Cal.Rptr.2d 142, 154–55, 52 P.3d 79, 89 (2002); *Coltec Indus.*

*Inc. v. Zurich Ins. Co.,* No. 99 C 1087, 2002 WL 31185789, at *9–10 n. 7 (N.D.Ill. Sept. 30, 2002); *E. Enters. v. Hanover Ins. Co.,* No. CIV. A. MICV93–01458, 1995 WL 499386, at *2 n. 17 (Mass.Super.Ct. Aug. 18, 1995). In *Dart Industries,* the court stated:

> [I]t is undisputed that in the present case there was a manuscript policy specifically written for dart [sic] for the five-year period of 1946–1951; it is therefore less likely that specimen policies, standardized policies or successor policies would be available or useful in establishing the contents of the policy. We see no reason why the lack of such "actual language" evidence should preclude Dart from obtaining the benefits of its policy. When, as here, it is undisputed that there was an insurance policy covering the relevant time period and that the policy was lost in good faith and not recovered after diligent search, there is no reason either in the law of contract or of evidence why secondary evidence that attests to the substance but not the precise language of an insurance policy should be insufficient as a matter of law to establish the insurer's contractual obligations.

*Dart Indus., Inc.,* 124 Cal.Rptr.2d at 154–55, 52 P.3d at 89. This language is not at odds with the Sixth Circuit's decision in *Harrow Products* because, as noted above, the Sixth Circuit recognized in that case that "a copy of the policy or a reasonable facsimile thereof" is not an absolute requirement for proof of the terms of a lost policy. *Harrow Prods., Inc.,* 64 F.3d at 1021.

The *Coltec Industries* and *Eastern Enterprises* cases both involved circumstances not present here. In *Coltec Industries,* the insured presented evidence that during the relevant time period, Zurich, the insurer, was a regular subscriber to the rating and policy services of the

National Bureau of Casualty Underwriters ("NBCU") for comprehensive general liability insurance. *Coltec Indus., Inc.,* 2002 WL 31185789, at *7. As an NBCU member, Zurich was required to use NBCU CGL forms unless it applied for and received approval to deviate from those forms. *Id.* The insured's evidence showed that the policies in question were written on two standard forms Zurich used during the relevant time period, both of which provided coverage for property damage caused by accident. *Id.* at *8. Although Zurich conceded that its forms were materially identical to the NBCU's forms, it argued that the insured was unable to establish the terms of the policy because in addition to using form policies during the relevant time period, Zurich also used manuscript policies and manuscript endorsements to tailor coverage for its insureds. *Id.* at *9 In addition, Zurich's expert testified that during the time in question, Zurich's practice was to modify its insurance coverage to meet the needs of a particular insured. *Id.* However, based upon a comparison of manuscript policies issued by Zurich to other insureds with standard CGL forms, the court found that even if the policies were manuscript policies, those manuscript policies would have included at least the coverage provided in Zurich's standard forms and possibly more coverage. *Id.* at *9–10.

Similarly, in *Eastern Enterprises,* the parties stipulated that the defendant insurers were members of the NBCU and were required to use NBCU forms during the relevant policy periods. *Eastern Enters.,* 1995 WL 499386, at *2 n. 17. As in *Coltec Industries,* one of the insurers argued that the terms of the lost policy may have been altered from the standard form if the policy was a manuscript policy. The court rejected the argument because the insurer's evidence did not support its assertion that the terms of the policy would have varied from the standard terms. *Id.* In addition, the court noted that the evidence indicated that other manuscript policies at issue in the case "mirrored" NBCU forms. *Id.*

In *Dart Industries,* the insured relied substantially upon the testimony of one witness, an employee of the company which served as an agent for the insurer and as a broker for the insured's account, as well as documentary evidence, to establish the material terms of the policy. *Dart Indus., Inc.,* 124 Cal.Rptr.2d at 148, 155–58, 52 P.3d at 84, 80–92. More specifically, the witness, who became familiar with the policy's product liability coverage through meetings regarding the policy's coverage and by answering the insured's question about a coverage matter, testified that the lost policy was occurrence-based and provided coverage for injuries arising out of ingestion of the drug diethylstilbestrol during the policy period, even if the injuries were not discovered until after the policy period ended. *Id.* at 155, 124 Cal. Rptr.2d 142, 52 P.3d at 90. The California Supreme Court held that the witness' testimony was not conclusory and that it was not required to be corroborated by documentary or other evidence. *Id.* at 155–56, 52 P.3d at 90. In addition, the court concluded that the witness' testimony was sufficiently detailed to allow the trier of fact to determine whether the policy provided coverage for the claimed injuries. *Id.* at 156–57, 52 P.3d at 91. Thus, the witness' testimony was sufficient to establish the material terms of the policy without proof of the precise language of the policy.

With regard to the terms of the policy, Aero cites testimony by Century's representative, Richardson, that: (1) INA LAB policies always contained, at a minimum, general liability and automobile liability coverage, (Richardson Dep. at 17), (2) LAB policy "tapes," or manuscript forms used to provide model language for manu-

script policies used the "all sums" language in the insuring agreement (*id.* at 53–54); (3) all policies contained a section regarding defense and settlement payments, (*id.* at 55–56); (4) he was not aware of any LAB tape that did not include the "in addition to the applicable limit of liability of this policy" language in the defense section of the policy, (*id.* at 77–78); and (5) LAB policies always included provisions regarding computation of premiums, notice of an occurrence or accident, assistance and cooperation of the insured, subrogation, assignment, cancellation, and other insurance, (*id.* at 59–63). Aero's expert, Talley, states that while the LAB manuscript policy was not based on a single form, the material terms of the LAB policy were based on language contained in standard forms used by the insurance industry and, therefore, the terms of the policy can be constructed with reasonable certainty. (Talley Aff. ¶ 10b.) In addition, Talley states that he examined and compared both a copy of INA LAB Policy No. 13200, issued to Sun Oil Company for the period October 1, 1962, to October 1, 1965, and a copy of an INA LAB manuscript policy worksheet produced by Century. (*Id.* ¶ 10f.) Although Talley notes some variation between the samples, he found that the insuring agreement, definitions, conditions, and exclusions all contained similar language consistent with standard wording found in industry forms at the relevant time. (*Id.* ¶ 10f.) The insuring agreements for both samples also contain coverage for "all sums" for which the insured is liable "because of injury to or destruction of property, including the loss of use thereof." (*Id.* ¶ 10g.) However, coverage in the Sun Oil policy is triggered by an "occurrence," whereas coverage in the policy worksheet is triggered by an "accident." (*Id.*) Talley concludes that the property damage provisions of LAB

Policy No. 16925 were based on the language in the manuscript worksheet rather than the sample Sun Oil policy, because the schedule of underlying policies indicates that the bodily injury limits for Policy 16925 were written on an occurrence basis and the property damage limits were written on an accident basis. (*Id.* ¶ 10h.) Further, the property damage limits were "split", with one set of limits for automobile accidents and a separate set of limits for operational accidents other than automobile accidents, which is consistent with the language of the manuscript worksheet. (*Id.* ¶ .) Talley also notes that the defense insuring agreements in both samples is essentially the same and were based upon standard wording in use in the industry during that time. (*Id.* ¶ 10j.)

The Court concludes that Aero's evidence is sufficient to allow Aero to meet its burden of establishing the material terms of Policy No. LAB 16925 with regard to its claim under the policy. In sum, Aero has established the term of the policy, the type of coverage relevant to the injury (property damage), and the limits of liability for that coverage. In addition, Aero's evidence demonstrates that the policy contained a separate defense provision and provided that defense costs are in addition to the limits of liability. Aero is not required, as Century suggests, to establish each provision of the policy word for word, but only to demonstrate the material terms of coverage. The fact that Aero cannot link the missing policy to a specific standard form is not fatal to Aero's claim, especially where Aero has shown that the material provisions that would have been included in the policy would not have differed in any material respect from sample provisions contained in INA manuscript worksheets or other sample policies issued by INA during the relevant time period.[4]

---

4. The Court notes that Century has offered no evidence that the terms under Policy LAB

Century also argues that Aero has failed to meet its burden because it has not presented any evidence showing that Policy No. LAB 16925 did not contain a "pollution exclusion." Aero, citing *Star Oil* and other cases, contends that in a lost policy case the insurer bears the burden of establishing the existence and applicability of any exclusion to coverage and, because Century has failed to present any evidence regarding the existence of a pollution exclusion, Century has not met its burden. Although the Court tends to agree with Aero on this issue, the Court need not decide which party bears the burden of proving exclusions because Aero's evidence is sufficient to show that the policy did not contain a pollution exclusion. Talley states in his affidavit that neither the Sun Oil policy nor any of the LAB policy samples or LAB worksheets contain pollution exclusions. (Talley Aff. ¶¶ 10k., 10l.) Talley states that the absence of pollution exclusions is consistent with underwriting practices at the time the policy was issued, because pollution exclusions were generally not in use until the 1970s. (*Id.* ¶ 10k.) Talley's conclusion is consistent with the recognition by courts that such exclusions were not generally in use in the insurance industry until the early 1970s. *See CPC Int'l v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77, 84 n. 8 (1st Cir.1992); *Hyde Athletic Indus., Inc. v. Continental Cas. Co.*, 969 F.Supp. 289, 303 (E.D.Pa. 1997). Further evidence of the lack of a pollution exclusion is found in INA Excess Policy No. XBC 5224, which was issued almost eight months after INA Policy No. LAB 16925 and which does not contain a pollution exclusion. Because INA issued both policies, it is reasonable to conclude that if INA required a pollution exclusion in the primary policy, it would have like-

wise required such an exclusion in the excess policy.

Century contends that a provision in the Sun Oil policy indicates that INA LAB policies limited coverage for pollution-related liabilities. That provision, found in the Conditions section of the policy, states:

> Injury to or destruction of property, including the loss of use thereof, caused by the intentional or wilful introduction of waste products, fluids or materials, including oil refuse, gas or gas bleed water, into any soil or inland or tidal waters, irrespective of whether the insured possessed knowledge of the harmful effects of such acts, shall not be deemed to be caused by accident or occurrence. *This condition, however, shall apply only to the insured's refinery operations.*

(Sun Oil Policy at 11, Talley Aff. Ex. 7 (emphasis added).) Talley states in his affidavit, however, that in the rare instances when he has observed pollution exclusion language in policies from the mid-1960s, the risks usually involved oil and petroleum refining and shipment. (Talley Aff. ¶ 10k.) Talley also states that he has never seen a pollution exclusion or limitation applied to a non-petroleum manufacturer such as Aero in a policy issued in the mid-1960s. (*Id.*) This conclusion is consistent both with the language of the above-quoted provision, which limits its application to the insured's refinery operations, and with Richardson's testimony that an underwriter may exercise his or her discretion to include an exclusion when the insured was engaged in production of chemicals or petroleum, or distributed automobile-related petroleum products. (Richardson Dep. at 90.) Given this evidence, the Court concludes that Aero's evi-

16925 for property damage coverage, payment of defense costs, or any other provision relevant to Aero's claim for coverage would

have differed in any significant way from the provisions in the Sun Oil LAB policy or the INA LAB manuscript policy worksheet.

dence is sufficient to show that the policy did not contain a pollution exclusion.[5]

■ Finally, at oral argument, Century's counsel argued that the existence of various "other insurance" clauses, and Aero's inability to prove with certainty which clause was included in the policy, mandates dismissal of Aero's claim. One version provides that the policy is in excess of any other policy also covering the loss, and the other version provides that the policy is the primary insurance. In *Dart Industries,* the court rejected the identical argument by the insurer that the insured's inability to prove which of three different other insurance clauses applied was fatal to the insured's claim. The court observed that while uncertainty as to the exact language of the clause might affect obligations among insurers, it had no bearing upon the insurer's obligations to the insured because the insurer's obligation to the insured is to provide coverage up to the limits of liability, regardless of apportionment. *Dart Indus., Inc.,* 124 Cal. Rptr.2d at 159–60, 52 P.3d at 93 (quoting *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.,* 45 Cal.App.4th 1, 105–06, 52 Cal.Rptr.2d 690 (1996)). In addition, the court noted that in cases involving successive insurers, "the modern trend is to require equitable contributions on a pro rata basis from all primary insurers regardless of the type of 'other insurance' clause in their policies." *Id.* at 159, 52 P.3d at 93; *see also Arco Indus. Corp. v. Am. Motorists Ins. Co.,* 232 Mich.App. 146, 160, 594 N.W.2d 61, 68 (1998) (discussing various methods of allocating liability among successive insurance policies in

cases involving property damage occurring over several years). The Court finds this analysis persuasive and, thus, rejects Century's argument.

### b. Century/INA Policy No. LAB 16994

■ Aero also contends that it can establish the material terms of coverage under Policy No. LAB 16994. Although the only evidence regarding this policy is the insurance ledger sheets for 1964–1966, Aero contends that the terms of coverage under this policy can be established through the same evidence which establishes the terms of coverage under Policy No. LAB 16925. In addition, Aero contends that because Policy No. LAB 16994 was a renewal of the earlier policy, it is presumed that the renewal policy contains the same terms, conditions, and exceptions as the original policy.

The insurance ledgers show that Policy No. LAB 16994 had a policy term of January 19, 1965, through January 19, 1966, but remained in effect only until July of 1965, when the Continental policy was issued. In addition, the ledger shows both policies, LAB 16925 and LAB 16994, provided property damage coverage of $25,000. While this evidence, by itself, would be insufficient to establish the material terms and conditions of the policy, it is reasonable to conclude that Policy No. LAB 16994 was a renewal of Policy No. LAB 16925 because the policies contained the same coverage limits, were the same types of policies (providing comprehensive coverage for comprehensive liability, in-

---

5. Century contends that the policy likely contained a pollution exclusion because Richardson testified that an underwriter would consider excluding pollution-related liabilities from coverage if he or she observed evidence of on-site dumping during an initial site-inspection. Century then points to testimony that Aero I began dumping waste on the property almost immediately after it occupied the property in 1964. Next, Century asserts that an underwriter could have observed dumping by Aero and required an exclusion in the policy. This argument must be rejected because it is based upon nothing more than Century's speculation and conjecture.

cluding property damage liability), and INA did not prepare an amendment to Excess Policy No. XBC 5224 reflecting a change in the schedule of underlying policies, as it did when the Continental policy became the primary policy. Thus, it may be presumed that the renewal policy adopts the same terms and conditions as the original policy. *Northeast Utils. v. Century Indem. Co.*, Nos. X03CV 990495495S, X03CV 980495496S, 1999 WL 476274, at *4 (Conn.Super. June 21, 1999) (collecting cases holding that unless a contrary intention is shown, a renewal policy is presumed to contain the same terms and conditions in the original policy). Moreover, Aero's evidence, including Richardson's testimony and Talley's testimony, is sufficient to establish the material terms and conditions of the policy relevant to Aero's claim.

#### c. Continental Policy No. CBP 40559

█ Endorsement 4 to the Schedule of Underlying Policies in INA Excess Policy XBC 5224 shows that Continental issued Policy No. CBP 40559, with a policy term of July 1, 1965, to July 1, 1966, and that the policy provided property damage coverage with limits of $100,000 per accident and bodily injury coverage with limits of $1 million per occurrence. Although Endorsement 4 indicates that the policy period expired on July 1, 1996, the Aero I insurance ledgers show that Policy No. CBP 40559 actually remained in effect until July 1, 1968. The insurance binder dated December 8, 1967, which references the policy, also confirms the extended policy period, and Continental does not dispute the fact that the policy remained in effect for three years. However, the Schedule of Underlying Insurance to INA Excess Policy No. XBC 60741, issued August 11, 1967, shows that the terms of coverage did not remain the same during the three year period because, at some point prior to that time, Policy No. CBP 40559 had been amended to reduce property damage coverage to $25,000 and to change the trigger from an accident to an occurrence.[6]

Although Endorsement 4 provides only some of the terms of coverage, Aero contends that it can establish the remaining material terms of coverage through Continental's Standard Form 600, which was produced by Continental in response to a subpoena. Aero contends that it has established a "clear link," as required by *Harrow Products, Inc.*, between Policy No. CBP 40559 and the form produced by Continental sufficient to establish the materials terms of the policy. In particular, Aero notes that the insuring agreement in Standard Form 600 mirrors the coverage terms summarized in Endorsement 4, because the property damage section (coverage B) of the form provides that Continental will pay all sums which the insured becomes legally obligated to pay because of property damage caused by an "accident." Although the bodily injury section (coverage A) of the form uses "accident," rather than "occurrence" as set forth in Endorsement 4, Aero contends that this language was amended by Endorsement Form CBP 601.[7] Aero also submits two

---

**6.** Continental notes that the schedule does not indicate the name of the insurer that issued the policy, as was the case with the schedules for the prior Excess Policy. However, based upon Aero's other evidence, it is reasonable to conclude that the policy was Continental's Policy No. CBP 40559.

**7.** Endorsement No. CBP 601, which was attached to the Form 600 produced by Continental, provides in part:

With respect to such insurance as is afforded under Coverage A of Part VI (Comprehensive General Liability), it is agreed as follows:

1. The words "caused by accident" are deleted from coverage A of Insuring Agreement I, and wherever the word "accident"

ISO CGL forms which Aero obtained by subpoena to ISO. One of the forms is dated July 6, 1955, and the other is dated February 1, 1966. The language of the July 6, 1955, form is almost identical to the Form CBP 600 produced by Continental, in that the trigger of coverage for both bodily injury and property damage liability is an "accident," whereas the trigger of coverage in the February 1, 1966, form is an "occurrence." [8] Aero contends that the ISO CGL forms demonstrate that the Continental Form 600 must have been in use at the time Continental issued Policy No. CBP 40559 because after 1966, Continental's forms would have used "occurrence" as the trigger of coverage for both bodily injury and property damage liability, consistent with the insurance industry's change to occurrence-based coverage in 1966.[9] Aero's expert, Talley, also testified that the usage of "accident" as the trigger of coverage for both bodily injury and personal property liability was consistent with insurance industry practice prior to 1966. (Talley Dep. at 137–38.)

Continental argues that it is entitled to summary judgment because Aero's evidence fails to establish the terms of Policy No. CBP 40559. Continental asserts that Aero cannot meet its burden because there is no evidence regarding many of the important policy provisions and because Aero cannot establish a "clear link" between the Form 600 and the missing policy. Continental points out that Gethard testified that the Form 600 was developed independently by Continental, i.e., not based upon

NBCU or ISO forms, and was used throughout the nation, subject to approval for use in a given state. (Gethard Dep. at 86–88.) Gethard also testified that there were several revisions of Form 600, designated by the letters "a" through "g" between 1961 and the late 1970s, and that the only way to determine when a particular form was revised would be by examining the "filing status report" for the revision, which no longer exists. (Id. at 48, 58–60.) Therefore, Continental argues, Aero cannot prove the specific version of Form 600 upon which policy CBP 40559 was based.

■■■ With regard to the period of July 1, 1965 to July 1, 1966, the Court concludes that Aero has presented sufficient secondary evidence to establish the material terms of Policy No. CBP 40559. Contrary to Continental's argument, Aero is not required to establish every provision of the policy in order to establish coverage. Aero's evidence establishes the policy term and limits and shows that the policy provided property damage coverage on an accident basis, at least during that one year term. In addition, Aero has been able to establish a link between the Form 600 produced by Aero and Policy No. CBP 40559, by showing that Form 600, along with Form Endorsement 601, contains the same property damage and bodily injury coverage terms as set forth in the schedule of underlying policies to INA Excess Policy No. XBC 5224. This evidence also shows that while the Form 600 itself may

appears elsewhere in Part VI, when applicable to coverage A, it shall be understood to mean an occurrence causing bodily injury, sickness, disease or death.

2. This endorsement does not apply to bodily injury, sickness, disease or death caused intentionally by or at the direction of the insured.

8. The Court also notes that the language of many of the other provisions of the 1955 ISO

form, including Defense, Settlement, Supplementary Payments and Definition of Insured is identical to the Form 600 produced by Continental.

9. Continental's representative, Robert Gethard, testified that Continental developed the CBP policy around 1960 or 1961. (Gethard Dep. at 14.)

have been independently developed, the individual coverage sections, such as CGL, were in fact derived from insurance industry forms. Aero has also shown that the Form 600 was in use prior to 1966, when Continental issued the policy to Aero I. Finally, Aero's evidence is sufficient to show that Policy No. CBP 40559 did not contain a pollution exclusion. Gethard testified that Continental did not begin to use pollution exclusions until at least the 1970s. (Gethard Dep. at 50.) With regard to the period of July 1, 1966 to July 1, 1968, the Court concludes that Continental is entitled to summary judgment on Aero's claim because, while Aero can establish through the insurance ledgers that the policy remained in effect until 1968, Aero cannot offer any evidence showing when the policy changed to occurrence-based coverage for property damage or when the limit of liability was reduced from $100,000 to $25,000. At best, the trier of fact would be required to speculate about these details.

### d. One Beacon/American Policy Nos. A13 40007–31 and AD 40018–13

■ The Aero I prepaid insurance ledgers establish that American issued Policy No. A13 40007–31 to Aero I on July 1, 1968, that the term of the policy ran until July 1, 1971, and that Aero I paid the premiums on the policy. As evidence of the terms of the policy, Aero has presented a copy of American Policy No. AD 40018–13, including the declarations page. There is no dispute that Policy No. AD 40018–13 is a renewal of Policy No. A13 40007–31. According to One Beacon's representative, Art Simmons, both policies were Special Multi–Peril ("SMP") policies, which used Multi–Line Bureau ("MLB") forms. (Simmons Dep. at 30–35.) The MLB forms included in an SMP policy are indicated on the declarations page of the policy. (*Id.* at 33–34.) The declarations page and MLB forms included in Policy

No. AD 40018–13 indicate that the policy provided property damage coverage for all sums which Aero I became obligated to pay because of an occurrence and that the limit of such liability was $100,000.

■ Because Policy No. AD 40018–13 is a renewal of Policy No. A13 40007–31, Aero may rely on the rule that unless an agreement to the contrary is shown, a renewal policy is presumed to be on the same terms, conditions, and amounts as provided in the original policy. *Patel v. Northfield Ins. Co.*, 940 F.Supp. 995, 1000 (N.D.Tex.1996) (citing *Liverpool & London & Globe Ins. Co. v. Swann*, 382 S.W.2d 521 (Tex.Civ.App.1964)); *Northeast Utils.*, 1999 WL 476274, at *4 (collecting cases). Although there is no evidence in the record to show any agreement or understanding that the terms of the renewal policy were different from those of the original policy, One Beacon contends that the presumption should not apply because Policy No. AD 40018–13 is incomplete and, therefore, cannot be used to reconstruct the terms of Policy No. A13 40007–31. However, One Beacon has not explained what material terms or conditions are missing from the policy or how any missing part might affect the remainder of the policy providing coverage for property damage. One Beacon also points out that its representative, Simmons, testified that terms and conditions of later policies frequently differ from those of earlier policies. (Simmons Dep. at 30.) In addition, One Beacon notes that there is no significance to the fact that the renewal and original policies were both SMP policies because Simmons testified that SMP policies were "package policies" tailored from several components, meaning that a renewal would not necessarily contain the same terms and conditions as the original. (*Id.*) This testimony is insufficient to rebut the presumption because it is based upon speculation

and fails to establish any agreement between the parties. Therefore, Aero has presented sufficient evidence of the terms of Policy No. A13–40007–31 through the terms of Policy No. AD 40018013.[10]

**▇▇▇▇** One Beacon also argues that Aero has failed to meet its burden because it has not shown that Policy No. A13–40007–31 did not contain a pollution exclusion. As noted above, the Court has found that the burden of establishing applicable exclusions is upon the insurer. However, even if it is the insured's burden to establish that coverage is not excluded, the evidence before the Court demonstrates that the policy did not contain a pollution exclusion. One Beacon relies on the fact that Policy No. AW40089–65, which was issued in 1972, after Aero II purchased the assets of Aero I, contained a "sudden and accidental" pollution exclusion, as evidence that the prior policies also contained pollution exclusions. One Beacon also points out that its representative, Simmons, testified that American first began including sudden and accidental pollution exclusions in 1970, prior to the date Policy No. AD 40018–13 was issued. (Simmons Dep. at 30.) However, the pollution exclusion, identified as MLB 227, is not listed on the declarations page for Policy No. AD 40018–13. (Declarations page, Policy No. AD 40018–13, Talley Aff. Ex. 18, Defs.' Br. Supp. Mot.) In contrast, MLB 227 is listed on the declarations page of Policy No. AW 40089–65. (Declarations page, Policy No. AW 40089–65, Talley Aff. Ex. 20, Defs.' Br. Supp. Mot.) Thus, the fact that the pollution exclusion was listed on the declara-

tions page for Policy No. AW 40089–65, but not on the declarations page for Policy No. AD 40018–13, is evidence that Policy No. A13 40007–31 did not contain a pollution exclusion. In addition, because of the presumption for renewal policies mentioned above, the absence of a pollution exclusion in Policy No. AD 40018–13 also proves the absence of a pollution exclusion in Policy No. A13 40007–31. Moreover, because Policy No. A13 40007–31 was issued in 1968—two years before American began incorporating pollution exclusions in SMP policies and prior to the existence of Form MLB 227—it is highly unlikely that the policy contained a pollution exclusion. Accordingly, the Court will deny One Beacon's motion for summary judgment on both policies.

## C. Aero's Motion for Partial Summary Judgment

Aero contends that it is entitled to partial summary judgment with regard to the terms of coverage for all policies because Century, Continental, and One Beacon have not presented any evidence to rebut Aero's evidence establishing the material terms of coverage under the policies. The Court concludes that Aero is entitled to summary judgment with regard to the existence and material terms of coverage for all policies. Regarding the existence of all policies, except INA Policy No. LAB 16994, the insurers concede that the policies at issue were, in fact, issued to Aero I.

With respect to INA Policy No. LAB 16925, Aero has shown that the policy: (1)

---

10. The schedule of underlying policies for INA Excess Policy No. XBC 76888, which was effective August 11, 1970, further supports Aero's claim that the renewal and original policies contained the same terms and conditions. Although the schedule does not identify either the insurer that issued the primary policy or the policy number, Policy No. A13 40007–31 had been in effect for over two

years and was the underlying policy at the time Policy No. XBC 76888 was issued. The schedule shows that the primary policy provided coverage for bodily injury liability with limits of $1,000,000 per occurrence and coverage for property damage liability with limits of $100,000 per occurrence. This is consistent with the coverage provided under the later-issued renewal policy.

had a term of January 19, 1964, to January 19, 1965; (2) provided coverage for property damage as a result of an accident; and (3) had a limit of $25,000 per accident. Aero has also shown through the testimony of Century's representative, Richardson, that LAB policies always used the "all sums" language in the insuring agreement, contained a section regarding defense and settlement payments, and included language stating that the amounts incurred for defense of claims is in addition to the applicable limit of liability. In addition, Aero has demonstrated through its expert, Talley, that pollution exclusions were not commonly used in the insurance industry during the 1960s, and it is unlikely that the policy contained a pollution exclusion. Aero has also shown that the insuring agreement, definitions, conditions, and exclusions in all the manuscript forms were similar and were consistent with standard wording found in industry forms during the relevant time. In fact, Aero has demonstrated a link between one of the manuscript worksheets and the missing policy through key terms of the property damage coverage set forth in the schedule of underlying policies.

Aero did not identify Policy No. LAB 16994 until after the initial round of motions and briefs was filed. Aero became aware of this policy when it discovered additional insurance ledger sheets, which indicated that Policy No. LAB 16994 was in effect for the period of January 19, 1965, to July 1, 1965. The insurance ledger also indicates that Policy No. LAB 16994, like Policy No. LAB 16925, provided property damage coverage with limits of $25,000. While the insurance ledger is the only documentary evidence Aero can offer specifically with regard to Policy No. LAB 16994, Aero's evidence regarding the terms of coverage for Policy No. LAB 16925 also establishes the terms of coverage for Policy No. LAB 16994.

With regard to Continental Policy No. CBP 40559, Aero's evidence shows that: (1) the policy term was from July 1, 1965, to July 1, 1966; (2) the policy provided coverage for property damage caused by an accident; and (3) the limit for property damage was $100,000 per accident. Continental has not presented any evidence to create a genuine issue regarding these facts. With regard to the remaining terms of the policy, Aero has demonstrated a "clear link" between the Form 600, including the Endorsement Form CBP 601, produced by Continental and Policy No. CBP 40559. Specifically, Aero has shown that Form 600, in conjunction with Endorsement Form CBP 601, provided coverage that directly corresponds with the coverage provided by Policy No. CBP 40559, e.g., bodily injury coverage based upon an "occurrence" and property damage coverage based upon an "accident." In addition, Aero has shown that the Form 600 would have been in use prior to 1966, when Policy No. CBP 40559 was issued, because the standard forms changed in 1966 to provide coverage for bodily injury and property damage on an "occurrence" basis. This is consistent with Aero's other evidence, which shows that the policy changed to an "occurrence" basis for both coverages in 1966 or 1967. This evidence also shows that, despite Continental's claim that CBP policies were developed independently of standard forms, the CGL coverage in those policies was based upon or consistent with standard form language. Finally, Aero has shown that the policy did not contain a pollution exclusion. In fact, Continental's expert, Gethard, testified that Continental did not use such exclusions until at least the 1970s.

With respect to One Beacon/American Policy No. A13 40007–31, Aero's prepaid insurance ledgers show that the policy was in effect from July 1, 1968, to July 1, 1971. Aero has presented further evidence of the terms of Policy No. A13 40007–31 through

the terms of Policy No. AD 40018–13, which is a renewal of Policy No. A13 40007–31. Although One Beacon asserts that Policy No. AD 40018–13 is incomplete, One Beacon has not shown any material component of the policy that is missing. In addition, the policy includes the declarations page, which shows the MLB forms included in the policy. Thus, giving effect to the presumption that a renewal policy is on the same terms, conditions, and amounts as the original policy, Aero has established the material terms of coverage under Policy No. A13 40007–31. There is no evidence that would indicate that the presumption should not apply. In fact, the schedule of underlying policies for INA Excess Policy No. XBC 76888 supports the application of the presumption because it indicates that the underlying policy in effect at that time (Policy No. A13 40007–31) provided coverage with the same limits as Policy No. AD 40018–13. Furthermore, as noted above, Aero has demonstrated that Policy No. A13 4007–31 did not include a pollution exclusion. As for Policy No. AD 40018–13, Aero has established the material terms of coverage through the copy of the policy, including the declarations page.

### D. Century's Motion for Sanctions

 In connection with its motion to strike late-produced documents, Century requested that the Court impose a sanction against Aero for its late production. In its October 9, 2002, Order, the Court refused to strike the late-produced documents but afforded Century and the other insurers the opportunity to re-depose Aero's representatives and witnesses regarding those documents. The Court also reserved ruling on the motion for sanctions until oral argument. As indicated at oral argument, the Court is convinced that Aero's late production was not the result of bad faith or dilatory conduct, but rather was the result of a good-faith oversight during a search for decades-old documents. Furthermore, Century and the other insurers have had the opportunity to re-depose Aero's witnesses regarding those documents and, thus, have not been prejudiced by the late production. Therefore, the Court concludes that sanctions are not warranted and will deny Century's motion.

### III. *Conclusion*

For the foregoing reasons, the Court will deny Continental's motion to exclude the testimony of Aero's expert, Douglas Talley. The Court will also deny the Century's motion for partial summary judgment and One Beacon's motion for partial summary judgment. The Court will deny Continental's motion for summary judgment with regard to the period of July 1, 1965 to July 1, 1966, and will grant Continental's motion with regard to the period of July 1, 1966 to July 1, 1968. The Court will grant Aero's motion for partial summary judgment with respect to all policies except Continental Policy No. CBP 40559 for the period July 1, 1966, to July 1, 1968. Finally, the Court will deny Century's motion for sanctions against Aero with respect to the late-produced documents.